**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

*January 15, 2025*

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 4:21-CR-301** |
| **v.** | |
| **CHRISTOPHER KNIGHT LOPEZ,**<br>**JAYSON LOPEZ** | |

<u>**SUPERSEDING INDICTMENT**</u>

The Grand Jury charges:

I.    <u>**GENERAL ALLEGATIONS**</u>

A.    <u>**The Fraudulent Scheme**</u>

1.    Beginning in or about May 2015, and continuing through the Present, the defendants Christopher Knight Lopez ("Christopher Lopez"), Jayson Lopez, and others known and unknown, engaged in an unlawful scheme to defraud their clients by soliciting money to invest based on materially false information. The defendants then misappropriated substantial portions of their clients' investments for their own personal use, and to pay false returns to other investors to create the false impression that their investments were generating real returns. This type of investment scheme is often referred to as a "Ponzi scheme." Some of the defendants' clients were companies seeking financing to fund large projects. In these cases, the defendants falsely claimed they could obtain financing for their clients. The defendants then charged their clients large upfront fees, and they never obtained the financing for their clients that they promised.

**B.**    **Entities Involved In The Fraudulent Scheme**

2.    Knight Nguyen Investments is a company located in Houston, Texas. Christopher Lopez filed the documents that formed Knight Nguyen Investments in Fort Bend County, Texas on or about March 30, 2015. Christopher Lopez was listed as the owner of the company.

3.    Knight Advisory and Planning is a company located in Katy, Texas. Christopher Lopez filed the documents that formed Knight Advisory and Planning in Fort Bend County, Texas on or about November 10, 2014. Christopher Lopez was listed as the owner of the company.

4.    Aevum Holdings Incorporated, is a company located in Orlando, Florida ("Aevum Holdings"). The documents that formed Aevum Holdings were filed in Florida on or about September 17, 2015 and was signed by Christopher Lopez. The President of Aevum Holdings was listed as Jayson Lopez.

5.    Blue Line Mining, Ltd. is a company located in the Republic of Cyprus ("Blue Line Mining (Cyprus)"). Cyprus is an island country located in the eastern Mediterranean Sea, approximately 40 miles south of Turkey and 100 miles west of Syria. The owners of Blue Line Mining (Cyprus) are purported to be Person H and Person Z. The Directors of Blue Line Mining (Cyprus) are Person H, Person S, Person M, and Person Z.

6.    Blue Line Mining LLC is a company located in Orlando, Florida ("Blue Line Mining (Florida)"). Jayson Lopez filed the documents that formed Blue Line Mining (Florida) on or about March 23, 2017. The Managers of Blue Line Mining (Florida) were listed as Jayson Lopez, Person H, and Person Z. The registered agent was listed as Christopher Lopez.

7.    Exempt Management LLC is a company located in Sheridan, Wyoming ("Exempt Management"). The documents that formed Exempt Management were filed in Wyoming on or about July 16, 2019. Christopher Lopez is listed as the owner of Exempt Management.

8.    Exempt Securities Fund I Limited Partnership is a company located in Houston, Texas ("Exempt Securities"). Christopher Lopez filed the documents that formed Exempt Securities on July 19, 2019. Christopher Lopez is listed as the General Partner of Exempt Securities.

9.    Ping An Financial Services Limited is a company located in the Republic of Cyprus ("Ping An (Cyprus)"). The owners of Ping An (Cyprus) are purported to be Person T-2 and Person Z. Person T-1 is listed as the Secretary, and the Directors are listed as Person S, Person M, and Person T-1.

10.    Ping An Financial Services Pte Ltd is a company purporting to be located in Singapore ("Ping An (Singapore)"). Jayson Lopez purports to be a Director of Ping An (Singapore).

11.    Ping An Financial Services Pte LLC is a company located in Orlando, Florida ("Ping An (Florida)"). The documents that formed Ping An (Florida) were filed in Florida on or about January 15, 2020. The documents list Jayson Lopez as the Manager and Ping An Financial Services Limited as a Member; however, the documents provide an address for Ping An Financial Services Limited that is located in Dublin, Ireland ("Ping An (Ireland)").

12.    Ping An Fund I Limited Partnership is a company located in Houston, Texas ("Ping An Fund"). The documents that formed Ping An Fund were filed in Wyoming on or about September 12, 2019, and they list Jayson Lopez as the only Partner.

C.    **The Mortgage Company Investment Scam**

i.    *The forged UBS account records*

13.    In or about 2016, Mortgage Company 1 was seeking to borrow money to increase its warehouse line of credit. Mortgage Company 1 was introduced to Christopher Lopez as a person

3

who could help them raise money. Christopher Lopez told Mortgage Company 1 that Aevum Holdings was willing to provide $2.5 million to Mortgage Company 1 at an interest rate of 8.0%. The $2.5 million Aevum Holdings was offering was purportedly being provided by Nadir Torres.

14.    On or about April 14, 2016, Nadir Torres opened two accounts at UBS Financial Services Inc. ("UBS") with account numbers xxxx137 and xxxx138. UBS account no. xxxx138 was the account that would purportedly hold the $2.5 million for Mortgage Company 1's benefit. However, no money was ever deposited into either of these UBS accounts.

15.    Also on or about April 14, 2016, Nadir Torres and Jayson Lopez executed an agreement described as a "Confidential Private Offering" for Aevum Holdings, a company owned by Jayson Lopez. Under the terms of the agreement, Nadir Torres purported to pay $2.5 million to Aevum Holdings in exchange for 2.5 million shares of Aevum Holdings stock. However, no money was ever transferred because the UBS accounts were never funded.

16.    On or about April 18, 2016, Nadir Torres told a UBS financial advisor that he wanted to wire between $500 million and $1 billion into his UBS account. Nadir Torres requested a letter from UBS stating that they can accept a bank guarantee wire within that range.

17.    On or about April 19, 2016, in response to Nadir Torres' request, UBS sent him a letter signed by UBS Employee 1. The letter stated that UBS could accept a wire transfer of funds between $500 million and $1 billion. The letter included wiring instructions for completing the wire transfer.

18.    On or about August 15, 2016, Christopher Lopez sent an email to Mortgage Company 1. Christopher Lopez attached to the email a purported screenshot of an online banking account summary for UBS accounts xxxx137 and xxxx138. The screenshot was forged to falsely claim that account xxxx137 contained $17.5 million, and that account xxxx138 contained $2.5

4

million. In truth and fact, neither account had any money in them. Christopher Lopez also attached to the email a forged letter purportedly from UBS. According to the fraudulent letter, UBS confirmed the balance of $2.5 million in account xxxx138. The letter was purportedly signed by UBS Employee 1, but the signature was forged and appears to have been digitally copied from the letter UBS sent to Nadir Torres on April 19, 2016.

19.    On or about August 18, 2016, Mortgage Company 1 entered into an agreement with Jayson Lopez, brokered by Christopher Lopez. Under the terms of the agreement, Jayson Lopez and Aevum Holdings would provide "investment reserve capital" of $2.5 million to Mortgage Company 1. The agreement also obligated Christopher Lopez, through his company Knight Nguyen Investments, to provide Mortgage Company 1 with a "bona fide account statement" showing liquid cash holdings in the amount of $2.5 million for the benefit of Mortgage Company 1. In return, Mortgage Company 1 agreed to pay $16,666.67 per month to Christopher Lopez through his company, Knight Nguyen Investments.

20.    On September 29, 2016, Christopher Lopez sent an email to Mortgage Company 1 with an attachment containing a forged letter purportedly from UBS. According to the fraudulent letter, UBS confirmed the balance of $2.5 million in account xxxx138 for the benefit of Mortgage Company 1. The letter was purportedly signed by UBS Employee 1, but the signature was forged and appears to have been digitally copied from the letter UBS sent to Nadir Torres on April 19, 2016.

21.    From on or about August 17, 2016 through June 16, 2017, Mortgage Company 1 paid Christopher Lopez via Knight Nguyen Investments a total of $173,656.93, which represented the interest payment they were required to make under the agreement with Christopher and Jayson Lopez on the non-existent $2.5 million.

*ii.    The misappropriation of Investor B's money*

22.    In September 2016, Investor B agreed to invest her retirement savings with Christopher Lopez. Christopher Lopez explained to Investor B that she would be investing $500,000 in Mortgage Company 1 in return for 9.25% interest. Mortgage Company 1 was supposed to pay monthly interest payments to Christopher Lopez, who would then transfer the payment to Investor B. Investor B's principal balance of $500,000 would be returned to her after five years.

23.    In or about late September 2016, Investor B transferred a total of approximately $671,456.43 to Christopher Lopez via Knight Nguyen Investments for him to manage. Investor B required Christopher Lopez to obtain her written, signed, and notarized authorization before he could invest any of her money.

24.    On or about October 11, 2016, Christopher Lopez transferred $449,900 belonging to Investor B to Mortgage Company 1. This investment principal was never returned to Investor B.

25.    On or about October 17, 2016, Christopher Lopez transferred $43,310 belonging to Investor B to Graphic Tools Company 1. Christopher Lopez never obtained Investor B's authorization to invest her money in Graphic Tools Company 1, and this investment principal was never returned to Investor B.

26.    On or about October 27, 2016, Christopher Lopez transferred $19,990 belonging to Investor B to Graphic Tools Company 1. Christopher Lopez never obtained Investor B's authorization to invest her money in Graphic Tools Company 1, and this investment principal was never returned to Investor B.

27.     On or about November 2, 2016, Christopher Lopez transferred $91,810 belonging to Investor B to Medical Device Company 1. Christopher Lopez never obtained Investor B's authorization to invest her money in Medical Device Company 1, and this investment principal was never returned to Investor B.

28.     From on or about November 1, 2016 to November 7, 2017, Mortgage Company 1 paid Christopher Lopez via Knight Nguyen Investments a total of $50,104.08, which represented the interest payment on Investor B's $500,000 investment.

29.     From on or about November 2, 2016 to November 1, 2017, Investor B received a total of $80,954.02 in purported returns from Christopher Lopez via Knight Nguyen Investments. However, Investor B never received the return of her $671,456.43 investment principal.

**D.      The Blue Line Mining Investment Scam**

30.     In or about March 2017, Christopher Lopez began to recruit investors to invest in a gold investment scam involving Blue Line Mining (Cyprus) and Blue Line Mining (Florida).

31.     On or about March 23, 2017, Jayson Lopez formed Blue Line Mining (Florida) in the State of Florida.

32.     Beginning in or about March 2017, Christopher Lopez and his associates solicited investors to invest money in "Blue Line Mining". Christopher Lopez and his associates told investors that they were investing in a company that purportedly purchased gold in west Africa, shipped it to a gold refinery in Lebanon, and sold the gold for a profit. Christopher Lopez and his associates told investors false information about the investment, including that they would receive very large returns, and that their money was covered by insurance and secured by gold. However, Christopher Lopez and Jayson Lopez knew the gold investment was a scam that would not result in the shipment and sale of any gold, and that it would not generate any returns for the investors.

33.     In or about late 2017, Christopher Lopez applied for professional liability insurance for coverage to begin November 13, 2017. Despite Christopher Lopez's claims to his clients that their gold was insured, the insurance policy he applied for was a professional liability policy against errors and omissions, not an insurance policy for gold. Furthermore, Christopher Lopez provided the following false information in the application for the insurance policy:

> a.     Christopher Lopez falsely described his type of business as "Project manager (architecture or engineering)," when in truth and fact he was conducting business as an investment advisor.

> b.     Christopher Lopez falsely stated that the majority of his projects fall into the category of "Residential Homes," when in truth and fact he was conducting business as an investment advisor.

34.     From in or about March 2017 through March 2018, Christopher Lopez and his associates raised over $1.1 million from investors in the gold investment scam. Jayson Lopez facilitated the movement of this money through various banking platforms to conceal the fact that a significant portion of this money was misappropriated by Christopher Lopez, Jayson Lopez, Nadir Torres, and their associates for their own personal use. Some of the money was also used to pay fake returns to other investors in furtherance of the Ponzi scheme.

35.     In or about June 2018, Christopher Lopez and his associates told investors about a purported shipment of 25.4 kg of gold worth over $1 million that would result in significant profits to the investors. In truth and fact, Christopher Lopez and Jayson Lopez knew that the 25.4 kg shipment of gold did not exist.

36.     From in or about May 2017 through May 2018, Christopher Lopez and Jayson Lopez paid fake returns to the investors to create the false impression that their investments were generating real returns, in furtherance the Blue Line Mining investment scam.

37.     On or about November 1, 2018 Christopher Lopez submitted an insurance claim on his professional liability insurance policy in an attempt to be paid for the supposed lost shipment of over $1 million worth of gold. During the claim process, Christopher Lopez submitted false information to the insurance company, including a letter that listed $950,107.73 in payments that were purportedly made to Blue Line Mining (Cyprus) via an electronic money payment system. In truth and fact, a significant majority of this money went to Christopher Lopez, Jayson Lopez, Nadir Torres, and their associates for their own personal use, and to pay fake returns to other investors in furtherance of the Ponzi scheme.

38.     On or about November 29, 2018, Christopher Lopez's insurance claim for the purported lost shipment of gold was denied because the insurance policy was limited to claims related to construction management services.

39.     The investors in the Blue Line Mining investment scam lost all of the money they invested, other than the fake returns they received between May 2017 and May 2018 as described above.

## E.     The Bioscience Company Investment Scam

40.     In or about early 2015, Christopher Lopez was introduced to Scientist 1. Scientist 1 and others had received a patent on an anti-cancer drug that also had other potential uses. Christopher Lopez offered to form a company to help Scientist 1 develop and commercialize the anti-cancer drug.

41.     On or about April 21, 2015, Christopher Lopez incorporated Bioscience Company 1 in the State of Florida. Christopher Lopez was identified as an Officer and the Registered Agent of the company. Scientist 1 was identified as the President of the company.

42.     In or about late 2016, Christopher Lopez and Jayson Lopez informed Scientist 1 about a company called Orchid Europe Ltd. they claimed was willing to invest $50 million into Bioscience Company 1. The name "Orchid Europe Ltd." was chosen by the defendants to create the false impression that this company was associated with Orchid Chemicals & Pharmaceuticals Ltd., also known as "Orchid Pharma Limited," a real pharmaceutical company headquartered in India.

43.     Christopher Lopez and Jayson Lopez falsely told Scientist 1 that Nadir Torres was the Chief Financial Officer of Orchid Europe, and that Orchid Europe would place approximately $50 million into a foreign bank account that Bioscience Company 1 would have access to after it reached clinical trials in its anti-cancer drug. In exchange, Bioscience Company 1 would issue shares of stock to Orchid Europe.

44.     On or about November 2, 2016, Christopher Lopez sent an email to Scientist 1 with the proposed agreement with Orchid Europe attached. The agreement contained a forged screen shot purporting to be a statement from the Royal Bank of Scotland ("RBS") for account number xxxx937 in the name of "Orchid Europe Ltd." The statement purports to show a balance of 50 million Euros in the account as of October 15, 2016, which would have equaled approximately $53 million. The account statement was fake because Orchid Europe did not have an account at RBS.

45.     On or about November 4, 2016, Nadir Torres and Christopher Lopez executed the above-described agreement between Orchid Europe and Knight Nguyen Investments. However, Christopher Lopez and Nadir Torres both knew the agreement was a sham because the $50 million did not exist.

46.    On or about March 28, 2017, Christopher Lopez sent an email to Scientist 1 and Jayson Lopez that said "50mm deposited" with an attachment that was a forged bank account statement purportedly issued by RBS for account xxxxx937 in the name of Bioscience Company 1. The statement showed a balance in the account of 50 million Euros, which would have equaled approximately $53 million. However, the bank statement was forged and neither the RBS account nor the 50 million Euros actually existed.

47.    From in or about January 2017 through December 2018, Christopher Lopez and his associates raised over $1.1 million from investors in the Bioscience Company investment scam. Christopher Lopez provided false and misleading information to actual and potential investors in furtherance of the scheme, including:

    a.    Christopher Lopez provided investors with false and fraudulent documents that inflated Bioscience Company 1's assets by including the non-existent $53 million RBS account.

    b.    Christopher Lopez falsely told investors that he was going to help Bioscience Company 1 become publicly traded on the Bermuda Stock Exchange, which would result in substantial profits to the investors. However, Christopher Lopez never got Bioscience Company 1 listed on any public stock exchange.

48.    On or about March 12, 2018, Christopher Lopez used the name, date of birth, and social security number of Scientist 1 in a credit card application submitted to American Express without Scientist 1's knowledge or permission. Christopher Lopez obtained credit cards in the name of Christopher Lopez, Jayson Lopez, and other associates of Christopher Lopez. Christopher Lopez and Jayson Lopez used these credit cards for personal expenses as well as business expenses.

49.    Christopher Lopez also obtained a credit card through this application in the name of Scientist 1. Christopher Lopez gave this card to Scientist 1 and left him with the mistaken

impression that the card was a corporate credit card issued to Scientist 1 as an employee of Bioscience Company 1, rather than a credit card in his personal name.

**F.**    **The Fake U.S. Treasury Bond Scam**

50.    In or about June 2019, Person A became business partners with Christopher and Jayson Lopez. At this time, Person A was in possession of two documents purporting to be U.S. Treasury Bonds bearing serial numbers F49494957B and F49495012B (collectively, "the Fake Bonds"). The Fake Bonds purport to be worth $1 billion each; however, both of these documents are fraudulent, they are not obligations of the U.S. Treasury, and they have no actual value whatsoever. Christopher Lopez, Jayson Lopez, and Person A entered into an agreement in which Person A transferred the Fake Bonds to Christopher and Jayson Lopez, which Christopher and Jayson Lopez used to fraudulently inflate the value of their companies and encourage people to invest money in those companies.

51.    In or about late 2019, Christopher Lopez, Jayson Lopez, and Persons M, S, T-1, T-2, Z, and others created a complex structure of companies named with some variation of "Ping An Financial Services" in furtherance of the Fake Bond scam. The name "Ping An Financial Services" was chosen to create the false impression that these companies were associated with Ping An Insurance Group, a real company located in China. Notably, Person Z, listed as a beneficial owner of Ping An (Cyprus), was also listed as a beneficial owner of Blue Line Mining (Cyprus). Also, Persons M and S, listed as Directors of Ping An (Cyprus), were also listed as Directors of Blue Line Mining (Cyprus).

52.    On or about January 11, 2020, Person A signed a document entitled "Fund Investment Manager Agreement," which transferred the Fake Bonds to Jayson Lopez. Jayson Lopez signed the agreement on behalf of Ping An (Singapore). The agreement also purported to

be signed by Person T-1 on behalf of Ping An (Singapore), and Person M on behalf of Ping An (Cyprus).

## G.    **Energy Company 1**

53.    In or about June 2019, Energy Company 1, a company headquartered in Houston, Texas, was looking for investors to fund a liquified natural gas project in Louisiana ("the LNG Project"). CEO B, the CEO of Energy Company 1, was introduced to Christopher Lopez as someone who could help Energy Company 1 raise money for the project.

54.    Christopher Lopez falsely told CEO B that he had access to $2 billion, and that he could obtain $50 million in U.S. Treasuries to invest in Energy Company 1. This was a reference to the Fake Bonds.

55.    Christopher Lopez proposed an agreement to CEO B where Christopher Lopez would help Energy Company 1 become publicly traded on the Bermuda Stock Exchange, which would result in substantial profits for Energy Company 1 shareholders. Christopher Lopez also falsely claimed that he had taken another company, Bioscience Company 1, public on the Bermuda Stock Exchange.

56.    Christopher Lopez introduced CEO B to Jayson Lopez as an officer of Ping An (Singapore). Jayson Lopez falsely told CEO B that Ping An (Singapore) had several billion dollars in Cyprus to invest. Jayson Lopez sent CEO B material purporting to be from the real Ping An Insurance Group in China to give CEO B the false impression that Jayson Lopez was affiliated with Ping An Insurance Group.

57.    In or about September 2019, Christopher Lopez falsely told CEO B that he needed $10,000 to keep Person A's $50 million available to invest in the LNG Project. However, as

Christopher Lopez well knew, this $50 million did not exist because Person A did not have $50 million, and the Fake Bonds were not authentic.

58.    On or about September 23, 2019, Energy Company 1 became skeptical about the authenticity of the Fake Bonds and requested an audit verifying that Christopher Lopez's company, Exempt Securities, actually owned $50 million in U.S. Treasury bonds.

59.    Despite its misgivings, and at Christopher Lopez's insistence, on or about September 24, 2019, Energy Company 1 wired $10,000 to Christopher Lopez through Exempt Management's BBVA account number ending in 6077 to keep the $50 million in Fake Bonds purportedly available to fund the LNG Project.

60.    On or about February 26, 2020, Christopher Lopez hired Auditor M to audit the financial statements for his company Exempt Securities. The financial statement Christopher Lopez sent Auditor M to audit claimed Exempt Securities owned $35 million of the Fake Bonds. Auditor M was unable to independently verify the authenticity of the Fake Bonds because Christopher Lopez advised Auditor M to contact Jayson Lopez to verify their authenticity. Despite being unable to independently verify the authenticity of the Fake Bonds, on or about March 15, 2020, Auditor M issued an Audit Report validating the Exempt Securities financial statement.

61.    On or about March 20, 2020, Christopher Lopez sent Auditor M's Audit Report to CEO B in an effort to obtain more money from Energy Company 1.

62.    Christopher Lopez never raised any money for Energy Company 1's LNG Project, and he never got Energy Company 1 listed on any public stock exchange.

**H.**    **Insurance Company 1**

63.    In or about late 2018, CEO F, the CEO of Insurance Company 1, was introduced to Jayson Lopez, and in or about November 2019, CEO F told Jayson Lopez he wanted to raise money

14

to purchase Real Estate Company 1 ("the Real Estate Project"). Jayson Lopez agreed to help CEO F raise money for the Real Estate Project through his company Ping An (Singapore) and other related entities.

64.     During the execution of the scheme, Jayson Lopez repeatedly sent CEO F marketing materials, news reports, and articles related to the real Ping An Insurance Group in China to give CEO F the false impression that Ping An (Singapore) was related to Ping An Insurance Group. As a result, CEO F was given a false sense of security that Jayson Lopez and Ping An (Singapore) would be able to follow through on their false promises.

65.     On or about December 12, 2019, Insurance Company 1 issued a check in the amount of $90,000 to Ping An (Singapore). According to Jayson Lopez, this payment was necessary before he would begin working on the Real Estate Project. On or about December 23, 2019, the check was deposited into Ping An (Singapore)'s BBVA account number ending in 4019.

66.     On or about February 6, 2020, Jayson Lopez and CEO F executed a "Subscription Agreement." In the agreement, Jayson Lopez falsely purported to transfer $250 million of the Fake Bonds from Ping An (Singapore) to Insurance Company 1, in exchange for 2 million shares of Insurance Company 1's stock.

67.     On or about February 19, 2020, Christopher Lopez prepared an "Asset Valuation Report". According to the report, the Fake Bonds were worth more than $400 million each. In the report, Chris Lopez falsely claimed that it was based in part on "U.S. Treasury Department checks & confirmed issuance on U.S. Fed Bond Serial Numbers F4949457B, F49495012B as valid issued serial numbers by the U.S. Federal Reserve." From February 3 to March 18, 2020, CEO F sent wires totaling $38,831.95 to Christopher Lopez through Knight Advisory and Planning's Bank of America account ending in 3062, as payment for the false report.

15

68.     In or about February 2020, Christopher Lopez told CEO F that he would need to have Insurance Company 1's financial statement audited in order to raise money off of the Fake Bonds. Accordingly, CEO F hired Auditor A to perform the audit for Insurance Company 1. The financial statements provided to Auditor A included the $250 million in Fake Bonds that Insurance Company 1 had purportedly obtained from Ping An (Singapore).

69.     On or about February 21, 2020, Auditor A asked Jayson Lopez for contact information for certain officers of Ping An (Singapore) in order to verify the authenticity of the Fake Bonds. Jayson Lopez provided Auditor A with email addresses for Person S, Person M, Person T-1 as the purported directors of Ping An (Singapore), Person I from "Compliance", and Person T-3 from "Legal." Jayson Lopez knew these individuals would falsely verify the authenticity of the Fake Bonds, because many of them had also been involved in the Blue Line Mining investment scam. Persons S and M had also been directors of Blue Line Mining (Cyprus), and Person T-3 had also purportedly worked in the "Legal Department" of Blue Line Mining (Cyprus).

70.     On or about February 24, 2020, Person T-3 sent an email to Auditor A falsely stating, "[Ping An (Singapore)] is the legal custodian of US Treasury Reserve Bonds Serial Numbers F49495012B and that title to the face value of $250 million USD has been transferred to [Insurance Company 1] by way of [Ping An Fund]." On or about February 26, 2020, Auditor A submitted an audit report to CEO F validating Insurance Company 1's financial statement including the $250 million in Fake Bonds.

71.     On or about May 1, 2020, Jayson Lopez sent an invoice to CEO F for $228,000 which was purportedly going to be used to fund the Real Estate Project. From May 8 through July

14, 2020, CEO F sent Jayson Lopez wire transfers totaling $228,000 to Ping An (Singapore)'s BBVA account number ending in 4019.

72.     On or about July 14, 2020, Jayson Lopez and CEO F signed a "Note Purchase Agreement" between Ping An Fund and Insurance Company 1. According to the agreement, Ping An Fund was going to pay Insurance Company 1 $250 million in exchange for $250 million worth of notes that would accrue interest. The $250 million Insurance Company 1 was going to receive was going to fund the purchase of Real Estate Company 1. In addition, "Upon execution of this [Note Purchase] Agreement," Ping An Fund was required to deposit $25 million in an escrow account for Insurance Company 1 to apply towards the purchase price of Real Estate Company 1. However, Insurance Company 1 never received any of this money.

73.     On or about April 16, 2021, CEO F received an invoice from Ping An (Singapore) for $28,950.00 for work purportedly done on the Real Estate Project. On or about April 20, 2021, CEO F sent Jayson Lopez a wire transfer of $28,950.00 to Ping An (Singapore)'s BBVA account number ending in 4019.

74.     In or about June 2021, Jayson Lopez told CEO F that he needed to send $200,000 in order to open up an account at Bank 1 for the Real Estate Project. This was false because Bank 1 does not charge any fees or require a minimum deposit to open up an account. On or about June 7, 2021, CEO F sent Jayson Lopez a wire transfer of $200,000.00 to Ping An (Singapore)'s BBVA account number ending in 4019.

75.     Insurance Company 1 never received any of the funding for the Real Estate Project that Christopher Lopez and Jayson Lopez had promised and the purchase of Real Estate Company 1 by Insurance Company 1 never occurred.

76.     Pursuant to the fraudulent scheme, Christopher Lopez, Jayson Lopez, and their associates defrauded Insurance Company 1 out of at least $594,385.75.

I.    **Investment Company 1**

77.     Investment Company 1 was formed to solicit money from primarily Australian investors. Investment Company 1 then looked for investment opportunities to invest these funds to generate a return for its clients.

78.     In or about June 2020, Director P, co-owner and Director of Investment Company 1, was introduced to Jayson Lopez. Jayson Lopez offered Director P purported opportunities to invest Investment Company 1's money through Ping An (Singapore) and its related entities.

79.     During the execution of the scheme, Jayson Lopez sent Director P marketing materials, news reports, and articles related to the real Ping An Insurance Group in China to give Director P the false impression that Ping An (Singapore) was related to Ping An Insurance Group. As a result, Director P was given a false sense of security that Jayson Lopez and Ping An (Singapore) would be able to follow through on their false promises.

80.     On or about November 4, 2020, Director P signed a "Product Sheet" on behalf of Investment Company 1. According to the Product Sheet, Investment Company 1 was purchasing 2 "Limited Partnership Units" in Ping An Fund for €200,000.00 (200,000.00 Euros). The Product Sheet claimed that Ping An Fund had assets totaling over $1.6 billion. On or about November 19, 2020, Director P wired $234,994.00 to Ping An (Singapore)'s BBVA account number ending in 4019 for the purchase of 2 Ping An Fund Limited Partnership Units.

81.     On or about December 15, 2020, Director P signed a second Product Sheet for Investment Company 1 to purchase another 8 Ping An Fund Limited Partnership Units for €800,000.00. On or about December 17, 2020, Director P wired $972,294.00 to Ping An

(Singapore)'s BBVA account number ending in 4019 for the purchase of 8 Ping An Fund Limited Partnership Units.

82.     On or about December 22, 2020, Director P signed a third Product Sheet for Investment Company 1 to purchase another 100 Ping An Fund Limited Partnership Units for $10 million. On or about December 24, 2020, Director P wired $9,999,994.00 to Ping An (Florida)'s Wells Fargo account number ending in 1640 for the purchase of 100 Ping An Fund Limited Partnership Units.

83.     Beginning in or about January 2021, Investment Company 1 made repeated attempts to withdraw money from its Ping An Fund investment. Each time, Jayson Lopez and his associates provided Investment Company 1 with excuses for why they could not send any funds at that time.

84.     In or about May 2021, Jayson Lopez told Director P that Investment Company 1 would have to invest another €500,000 in order to be able to redeem money from its Ping An Fund investment. From May 7 to June 3, 2021, Director P wired a total of $542,272.00 to Ping An (Florida)'s Wells Fargo account number ending in 1640.

85.     None of the money that Investment Company 1 invested was ever returned. Consequently, pursuant to the fraudulent scheme, Christopher Lopez, Jayson Lopez and their associates defrauded Investment Company 1 out of at least $11,874,642.00.

**J.     <u>Sports Company 1</u>**

86.     In or about June 2023, CEO T, the CEO of Sports Company 1, was introduced to Christopher Lopez. CEO T was looking for funding for Sports Company 1. Christopher Lopez told CEO T that he could obtain $20 million in financing for Sports Company 1.

87.     On or about September 24, 2023, CEO T signed a "Purchase Agreement" with Investment Company 2 in which Sports Company 1 would borrow $10 million from Investment Company 2. Christopher Lopez facilitated the agreement, and Person L signed the Purchase Agreement as the "Manager" of Investment Company 2. Person L was also described in other communications from Christopher Lopez as the CEO of Christopher Lopez's company, Knight Advisory and Planning. The agreement specified a "funding deadline" of October 1, 2024. Christopher Lopez falsely told CEO T that the deal was bonded by insurance in case of "fraud, misrepresentation, or misstatements."

88.     In or about early 2024, Christopher Lopez changed the Sports Company 1 financing arrangement. On or about March 22, 2024, CEO T signed a "Stock Purchase Agreement" with Investment Company 2 in which Sports Company 1 would sell $20 million worth of its stock to Investment Company 2 for up to $2.00 per share. The agreement claimed that Investment Company 2 had $16 billion in assets. The agreement required Sports Company 1 to pay a nonrefundable advance fee of $225,000. Person L signed the agreement on behalf of Investment Company 2.

89.     On or about April 17, 2024, Christopher Lopez told CEO T that Sports Company 1 needed to pay $1,000 to be eligible for the deal. Christopher Lopez asked CEO T to make the payment using PayPal. On or about April 18, 2024, CEO T sent Christopher Lopez $1,000 through PayPal.

90.     On or about July 31, 2024, Christopher Lopez told CEO T that he had found a person willing to invest $20 million, and, as a result of this new investor, the advance fee that Sports Company 1 was required to pay under the "Stock Purchase Agreement" was reduced from $225,000 down to $25,000.

91.     On or about September 4, 2024, CEO T wired $24,800 to Christopher Lopez through Knight Advisory and Planning's IBC Bank account ending in 9532 representing the advance fee due under Sports Company 1's Stock Purchase Agreement.

92.     After receiving the advance fee payment, Christopher Lopez changed the terms of the deal again by reducing the amount of funding Sports Company 1 would receive. On or about September 13, 2024, Christopher Lopez sent CEO T a new deal in which Sports Company 1 would sell its shares for $1 million, rather than the $20 million previously agreed to.

93.     On or about November 4, 2024, Christopher Lopez told CEO T that he needed to pay an additional $59,000 or the deal would go away.

94.     On or about November 9, 2024, Christopher Lopez sent CEO T an email that stated he was not going to do any more work to obtain funding for Sports Company 1, and Christopher Lopez claimed that CEO T still owed him $40,000.

95.     Pursuant to the fraudulent scheme, Christopher Lopez and his associates defrauded Sports Company 1 out of at least $25,800.00.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud, 18 U.S.C. § 371)

96.     Paragraphs 1 through 95 of this Indictment are hereby incorporated by reference as though fully set forth herein.

97.     The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

       a.     Forging bank statements and other records, and providing these fake documents to investors and others in furtherance of the fraudulent scheme.

       b.     Misrepresenting the risks associated with the investments their clients were making, including promising high returns with little or no risk.

21

c.    Making false statements about the finances and accomplishments of the companies their clients invested in.

d.    Using funds received from new investors to pay fake "returns" to earlier investors to create the false impression among their clients that their investments were generating real returns.

e.    Misappropriating investors' money to their own personal use.

f.    Moving investors' money between the defendants' various investment scams without authorization.

g.    Creating shell companies with names similar to large, reputable companies and making false statements designed to mislead investors into believing the Defendants were affiliated with those large companies.

h.    Making false statements about investments being insured to mislead investors into believing the investments had little to no risk.

i.    Making false statements to clients and potential clients to convince them to pay upfront fees.

j.    Providing false information about the Fake Bonds to auditors to obtain audit reports purporting to verify the authenticity of the Fake Bonds, and sending these false audit reports to their victims to mislead them into believing that the Fake Bonds were real.

98.    From in or about May 2015, and continuing through the date of this Superseding Indictment, in the Southern District of Texas and elsewhere, the defendants,

**CHRISTOPHER KNIGHT LOPEZ, and
JAYSON LOPEZ,**

knowingly and willfully conspired and agreed with each other, and other persons both known and unknown, to commit offenses against the United States, to wit: wire fraud, in violation of 18 U.S.C. § 1343, that is to devise and intend to devise, with intent to defraud, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted, by means of wire communication in interstate or foreign commerce, writings and signals for the purpose of

22

executing the scheme and artifice, and at least one conspirator did at least one overt act alleged above in paragraphs 1-95, to effect the object of the conspiracy. All in violation of 18 U.S.C. § 371.

## COUNTS TWO THROUGH TWENTY-SIX
### (Wire Fraud, 18 U.S.C. § 1343)

99.    Paragraphs 1 through 95 of this Indictment are hereby incorporated by reference as though fully set forth herein.

100.    From in or about May 2015, and continuing through the date of this Superseding Indictment, in the Southern District of Texas and elsewhere, the defendants,

**CHRISTOPHER KNIGHT LOPEZ, and
JAYSON LOPEZ,**

and others devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

101.    On or about each of the dates listed in the table below, in the Southern District of Texas, and elsewhere, the defendants, aiding and abetting each other and others, for the purpose of executing the scheme described above, did transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, the following writings and signals, as more specifically described below:

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| 2 | August 17, 2016 | Wire transfer of $16,666.66 from Eagle Bank account xxxx7962 to Christopher Lopez via Knight Nguyen Investments Bank of America account xxxx3495. |
| 3 | November 1, 2016 | Wire transfer of $3,854.16 from Eagle Bank account xxxx7962 to Christopher Lopez via Knight Nguyen Investments Bank of America account xxxx3495. |

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------|-----------------------------------|
| 4 | January 30, 2017 | Wire transfer of $86,000.00 from Wells Fargo Bank account xxxx5635 to Christopher Lopez via Knight Investments Trust Capital One Bank account xxxx8162. |
| 5 | March 9, 2017 | Wire transfer of $100,000.00 from Wells Fargo Bank account xxxx5635 to Christopher Lopez via Knight Investments Trust Capital One Bank account xxxx8162. |
| 6 | March 27, 2017 | Wire transfer of $280,000.00 from Compass Bank account xxxx5278 to Christopher Lopez via Knight Nguyen Investments Bank of America account xxxx3964. |
| 7 | June 27, 2017 | Wire transfer of $46,000.00 from Icon Bank of Texas account xxxx2114 to Jayson Lopez via Blue Line Mining LLC Bank of America account xxxx2621. |
| 8 | June 27, 2017 | Wire transfer of $37,000.00 from Icon Bank of Texas account xxxx2114 to Jayson Lopez via Blue Line Mining LLC Bank of America account xxxx2621. |
| 9 | June 27, 2017 | Wire transfer of $30,000.00 from Icon Bank of Texas account xxxx2114 to Jayson Lopez via Blue Line Mining LLC Bank of America account xxxx2621. |
| 10 | June 27, 2017 | Wire transfer of $27,000.00 from Icon Bank of Texas account xxxx2114 to Jayson Lopez via Blue Line Mining LLC Bank of America account xxxx2621. |
| 11 | July 18, 2017 | Wire transfer of $75,000.00 from Icon Bank of Texas account xxxx2114 to Jayson Lopez via Blue Line Mining LLC Bank of America account xxxx2621. |
| 12 | September 7, 2017 | Wire transfer of $92,000.00 from Icon Bank of Texas account xxxx2114 to Jayson Lopez via Blue Line Mining LLC Bank of America account xxxx2621. |
| 13 | January 9, 2018 | Wire transfer of $92,000.00 from Icon Bank of Texas account xxxx2114 to Jayson Lopez via Blue Line Mining LLC Bank of America account xxxx2621. |
| 14 | March 16, 2018 | Wire transfer of $52,000.00 from Icon Bank of Texas account xxxx2114 to Bioscience Company 1's Bank of America account xxxx2615. |

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------|-----------------------------------|
| 15 | June 18, 2018 | Wire transfer of $146,000.00 from Icon Bank of Texas account xxxx2114 to Bioscience Company 1's Bank of America account xxxx2615. |
| 16 | June 18, 2018 | Wire transfer of $30,500.00 from Icon Bank of Texas account xxxx2114 to Bioscience Company 1's Bank of America account xxxx2615. |
| 17 | May 8, 2020 | Wire transfer of $23,000.00 from Wells Fargo account xxxx1397 to Knight Advisory and Planning's Bank of America account xxxx3062. |
| 18 | May 8, 2020 | Wire transfer of $25,000.00 from Wells Fargo account xxxx1397 to Ping An (Singapore)'s BBVA account xxxx4019. |
| 19 | May 15, 2020 | Wire transfer of $63,000.00 from Wells Fargo account xxxx1397 to Ping An (Singapore)'s BBVA account xxxx4019. |
| 20 | June 23, 2020 | Wire transfer of $100,000.00 from Wells Fargo account xxxx1397 to Ping An (Singapore)'s BBVA account xxxx4019. |
| 21 | July 14, 2020 | Wire transfer of $40,000.00 from Wells Fargo account xxxx1397 to Ping An (Singapore)'s BBVA account xxxx4019. |
| 22 | November 19, 2020 | Wire transfer of $234,994.00 from Commonwealth Bank of Australia account xxx8048 to Ping An (Singapore)'s BBVA account xxxx4019. |
| 23 | December 17, 2020 | Wire transfer of $972,294.00 from Commonwealth Bank of Australia account xxx8048 to Ping An (Singapore)'s BBVA account xxxx4019. |
| 24 | December 24, 2020 | Wire transfer of $9,999,994.00 from Commonwealth Bank of Australia account xxx9155 to Ping An (Florida)'s Wells Fargo account xxxx1640. |
| 25 | April 20, 2021 | Wire transfer of $28,950.00 from Wells Fargo account xxxx1397 to Ping An (Singapore)'s BBVA account xxxx4019. |

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------|-----------------------------------|
| 26 | June 7, 2021 | Wire transfer of $200,000.00 from Wells Fargo account xxxx1397 to Ping An (Singapore)'s BBVA account xxxx4019. |

### COUNT TWENTY-SEVEN
### (Wire Fraud, 18 U.S.C. § 1343)

102.    Paragraphs 1 through 95 of this Indictment are hereby incorporated by reference as though fully set forth herein.

103.    From in or about May 2015, and continuing through the date of this Superseding Indictment, in the Southern District of Texas and elsewhere, the defendants,

### CHRISTOPHER KNIGHT LOPEZ

and others devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

104.    On or about September 4, 2024, in the Southern District of Texas, and elsewhere, the defendant, aiding and abetting others, for the purpose of executing the scheme described above, did transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce the following writings and signals: a wire transfer of $24,800.00 from Umpqua Bank account xxxx7142 to Knight Advisory and Planning's IBC Bank account xxxx9532, in violation of 18 U.S.C. § 1343.

### COUNTS TWENTY-EIGHT AND TWENTY-NINE
### (Aggravated Identity Theft, 18 U.S.C. § 1028A)

105.    The allegations contained in paragraphs 1 through 95 of this Indictment are hereby incorporated by reference as though fully set forth herein.

106.    On or about each of the dates in the table below, in the Southern District of Texas and elsewhere, the defendants,

**CHRISTOPHER KNIGHT LOPEZ, and**
**JAYSON LOPEZ,**

aiding and abetting each other, did knowingly transfer, possess, and use, without lawful authority,

a means of identification of another person during and in relation to a felony violation enumerated

in 18 U.S.C. § 1028A(c), that is violations of 18 U.S.C. §§ 1343 (wire fraud), and 1349

(conspiracy), knowing that the means of identification belonged to another actual person, all in

violation of 18 U.S.C. § 1028A(a)(1), as further described in the table below:

| COUNT | DATE | MEANS OF IDENTIFICATION |
|---|---|---|
| 28 | August 15, 2016 | Name and signature of UBS Employee 1, in relation to a violation of 18 U.S.C. § 1343 (wire fraud) as charged in Count 2, and § 1349 (conspiracy). |
| 29 | September 29, 2016 | Name and signature of UBS Employee 1, in relation to a violation of 18 U.S.C. § 1343 (wire fraud) as charged in Count 2, and § 1349 (conspiracy). |

**COUNT THIRTY**
**(Aggravated Identity Theft, 18 U.S.C. § 1028A)**

107.    The allegations contained in paragraphs 1 through 95 of this Indictment are hereby

incorporated by reference as though fully set forth herein.

108.    On or about March 12, 2018, in the Southern District of Texas and elsewhere, the

defendant,

**CHRISTOPHER KNIGHT LOPEZ,**

did knowingly transfer, possess, and use, without lawful authority, a means of identification of

another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c),

that is violations of 18 U.S.C. §§ 1343 (wire fraud), and 1349 (conspiracy), knowing that the means

of identification belonged to another actual person, that is: Christopher Lopez used the name, date

of birth, and social security number of Scientist 1 in a credit card application submitted to American Express on or about March 12, 2018, without lawful authority.

### COUNT THIRTY-ONE
### (Bankruptcy Fraud, 18 U.S.C. § 157(1))

A.     **The Bankruptcy Process**

109.     A voluntary bankruptcy case is begun by the filing of a bankruptcy petition, and the person who files that petition is a "debtor" under federal bankruptcy law. The process is conducted in a federal court and is governed by the United States Bankruptcy Code, which is found in Title 11 of the United States Code.

110.     Bankruptcy is a process by which a debtor obtains relief from creditors (those who are owed money by the debtor). The process is designed to achieve an orderly transfer of a debtor's assets to the creditors in return for a discharge or release of the debts that the debtor incurred prior to filing for the bankruptcy.

111.     Upon the filing of a bankruptcy petition, a debtor is required by law to fully disclose his or her financial circumstances, including, among other things, assets, liabilities (debts), and income. A bankruptcy "estate" is created upon the filing of a bankruptcy petition, which is a collective reference to all property in which the debtor has an interest.

112.     A bankruptcy filed under chapter 7, also known as a straight or liquidation bankruptcy, is a type of bankruptcy that can eliminate or discharge a debtor's unsecured debts. When a debtor files a petition for chapter 7 bankruptcy, there is an automatic stay that prevents creditors from collecting money or property they are owed by the debtor until the stay is lifted. As long as the stay is in effect, creditors generally may not initiate or continue lawsuits, wage garnishments, or even make telephone calls demanding payments.

113.    During a chapter 7 bankruptcy, a trustee is appointed to administer the case and liquidate the debtor's nonexempt assets. They will sell certain property the bankruptcy code does not let a debtor keep (nonexempt property) and use the proceeds to repay the creditors. The proceeds of this liquidation will be distributed to the debtor's unsecured creditors. If there are no nonexempt assets, which cases are referred to as "no asset" cases, then the debtor's unsecured creditors will not receive any money. Most chapter 7 bankruptcy cases are "no asset" cases.

114.    At the end of a chapter 7 bankruptcy, all of the debtor's unpaid debt (with some exceptions) is eliminated or discharged, which means the debtor does not have to pay them back. A creditor may no longer initiate or continue any legal or other action against the debtor to collect a debt that has been discharged.

**B.    The Scheme and Artifice to Defraud**

115.    The allegations contained in paragraphs 1 through 95 of this Indictment are hereby incorporated by reference as though fully set forth herein.

116.    On or about February 23, 2019, in the Southern District of Texas and elsewhere, the defendant,

**CHRISTOPHER KNIGHT LOPEZ,**

having devised and intended to devise the scheme and artifice to defraud described above, and for the purpose of executing and concealing said scheme and artifice and attempting to do so, filed a petition under Title 11, United States Code, that is: a chapter 7 petition for bankruptcy in the U.S. Bankruptcy Court in Houston, Texas, in violation of 18 U.S.C. § 157(1).

## NOTICE OF CRIMINAL FORFEITURE
## 18 U.S.C. §§ 981(a)(1)(C) & 982(a)(2); 28 U.S.C. § 2461

Pursuant Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2) and to Title 28, United States Code, Section 2461, the United States gives notice to the defendants,

**CHRISTOPHER KNIGHT LOPEZ, and**
**JAYSON LOPEZ,**

that in the event of conviction of any of the offenses charged in Counts 1-27 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses, including but not limited to:

1. Real Property Located at 5266 Crimson Flagg Ct., Katy, TX;

2. Approximately $893,997.27 in funds from Wells Fargo Advisors Account ****-3247 in the name of Ping An Financial Services PTE LLC;

3. Approximately $9,936,166.39 in funds from Wells Fargo Advisors Account ****-1640 in the name of Ping An Financial Services PTE LLC.

**Money Judgment and Substitute Assets**

The United States also intends to seek the imposition of a money judgment against the defendants. In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the defendants in substitution up to the total value of the property subject to forfeiture.

A TRUE BILL:

**Original Signature on File**

FOREPERSON OF THE GRAND JURY

Alamdar S. Hamdani
United States Attorney

_____

Justin R. Martin
Assistant United States Attorney