## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 4:21-CR-301** |
| **v.** | |
| **CHRISTOPHER KNIGHT LOPEZ** | |

## INFORMATION

The United States Attorney charges:

## I.    GENERAL ALLEGATIONS

### A.    The Fraudulent Scheme

1.      Beginning in or about May 2015, and continuing through January 15, 2025, the defendant Christopher Knight Lopez and others, including Jayson Lopez, engaged in an unlawful scheme to defraud their clients by soliciting money to invest based on materially false information. Christopher Lopez and his associates then misappropriated substantial portions of their clients' investments for their own personal use, and to pay false returns to other investors to create the false impression that their investments were generating real returns. This type of investment scheme is often referred to as a "Ponzi scheme." Some of their clients were companies seeking financing to fund large projects. In these cases, Christopher Lopez and his associates falsely claimed they could obtain financing for their clients. Christopher Lopez and his associates then charged their clients large upfront fees, and they never obtained the financing for their clients that they promised.

**B.**    **Entities Involved In The Fraudulent Scheme**

2.    Knight Nguyen Investments is a company located in Houston, Texas. Christopher Lopez filed the documents that formed Knight Nguyen Investments in Fort Bend County, Texas on or about March 30, 2015. Christopher Lopez was listed as the owner of the company.

3.    Knight Advisory and Planning is a company located in Katy, Texas. Christopher Lopez filed the documents that formed Knight Advisory and Planning in Fort Bend County, Texas on or about November 10, 2014. Christopher Lopez was listed as the owner of the company.

4.    Aevum Holdings Incorporated, is a company located in Orlando, Florida ("Aevum Holdings"). The documents that formed Aevum Holdings were filed in Florida on or about September 17, 2015 and was signed by Christopher Lopez. The President of Aevum Holdings was listed as Jayson Lopez.

5.    Blue Line Mining, Ltd. is a company located in the Republic of Cyprus ("Blue Line Mining (Cyprus)"). Cyprus is an island country located in the eastern Mediterranean Sea, approximately 40 miles south of Turkey and 100 miles west of Syria. The owners of Blue Line Mining (Cyprus) are purported to be Person H and Person Z. The Directors of Blue Line Mining (Cyprus) are Person H, Person S, Person M, and Person Z.

6.    Blue Line Mining LLC is a company located in Orlando, Florida ("Blue Line Mining (Florida)"). Jayson Lopez filed the documents that formed Blue Line Mining (Florida) on or about March 23, 2017. The Managers of Blue Line Mining (Florida) were listed as Jayson Lopez, Person H, and Person Z. The registered agent was listed as Christopher Lopez.

7.      Exempt Management LLC is a company located in Sheridan, Wyoming ("Exempt Management"). The documents that formed Exempt Management were filed in Wyoming on or about July 16, 2019. Christopher Lopez is listed as the owner of Exempt Management.

8.      Exempt Securities Fund I Limited Partnership is a company located in Houston, Texas ("Exempt Securities"). Christopher Lopez filed the documents that formed Exempt Securities on July 19, 2019. Christopher Lopez is listed as the General Partner of Exempt Securities.

9.      Ping An Financial Services Limited is a company located in the Republic of Cyprus ("Ping An (Cyprus)"). The owners of Ping An (Cyprus) are purported to be Person T-2 and Person Z. Person T-1 is listed as the Secretary, and the Directors are listed as Person S, Person M, and Person T-1.

10.     Ping An Financial Services Pte Ltd is a company purporting to be located in Singapore ("Ping An (Singapore)"). Jayson Lopez purports to be a Director of Ping An (Singapore).

11.     Ping An Financial Services Pte LLC is a company located in Orlando, Florida ("Ping An (Florida)"). The documents that formed Ping An (Florida) were filed in Florida on or about January 15, 2020. The documents list Jayson Lopez as the Manager and Ping An Financial Services Limited as a Member; however, the documents provide an address for Ping An Financial Services Limited that is located in Dublin, Ireland ("Ping An (Ireland)").

12.     Ping An Fund I Limited Partnership is a company located in Houston, Texas ("Ping An Fund"). The documents that formed Ping An Fund were filed in Wyoming on or about September 12, 2019, and they list Jayson Lopez as the only Partner.

C.     **The Mortgage Company Investment Scam**

                *i.     The forged UBS account records*

13.     In or about 2016, Mortgage Company 1 was seeking to borrow money to increase its warehouse line of credit. Mortgage Company 1 was introduced to Christopher Lopez as a person who could help them raise money. Christopher Lopez told Mortgage Company 1 that Aevum Holdings was willing to provide $2.5 million to Mortgage Company 1 at an interest rate of 8.0%. The $2.5 million Aevum Holdings was offering was purportedly being provided by Nadir Torres.

14.     On or about April 14, 2016, Nadir Torres opened two accounts at UBS Financial Services Inc. ("UBS") with account numbers xxxx137 and xxxx138. UBS account no. xxxx138 was the account that would purportedly hold the $2.5 million for Mortgage Company 1's benefit. However, no money was ever deposited into either of these UBS accounts.

15.     Also on or about April 14, 2016, Nadir Torres and Jayson Lopez executed an agreement described as a "Confidential Private Offering" for Aevum Holdings, a company owned by Jayson Lopez. Under the terms of the agreement, Nadir Torres purported to pay $2.5 million to Aevum Holdings in exchange for 2.5 million shares of Aevum Holdings stock. However, no money was ever transferred because the UBS accounts were never funded.

16.     On or about April 18, 2016, Nadir Torres told a UBS financial advisor that he wanted to wire between $500 million and $1 billion into his UBS account. Nadir Torres requested a letter from UBS stating that they can accept a bank guarantee wire within that range.

17.     On or about April 19, 2016, in response to Nadir Torres' request, UBS sent him a letter signed by UBS Employee 1. The letter stated that UBS could accept a wire transfer of

funds between $500 million and $1 billion. The letter included wiring instructions for completing the wire transfer.

18.     On or about August 15, 2016, Christopher Lopez sent an email to Mortgage Company 1. Christopher Lopez attached to the email a purported screenshot of an online banking account summary for UBS accounts xxxx137 and xxxx138. The screenshot was forged to falsely claim that account xxxx137 contained $17.5 million, and that account xxxx138 contained $2.5 million. In truth and fact, neither account had any money in them. Christopher Lopez also attached to the email a forged letter purportedly from UBS. According to the fraudulent letter, UBS confirmed the balance of $2.5 million in account xxxx138. The letter was purportedly signed by UBS Employee 1, but the signature was forged and appears to have been digitally copied from the letter UBS sent to Nadir Torres on April 19, 2016.

19.     On or about August 18, 2016, Mortgage Company 1 entered into an agreement with Jayson Lopez, brokered by Christopher Lopez. Under the terms of the agreement, Jayson Lopez and Aevum Holdings would provide "investment reserve capital" of $2.5 million to Mortgage Company 1. The agreement also obligated Christopher Lopez, through his company Knight Nguyen Investments, to provide Mortgage Company 1 with a "bona fide account statement" showing liquid cash holdings in the amount of $2.5 million for the benefit of Mortgage Company 1. In return, Mortgage Company 1 agreed to pay $16,666.67 per month to Christopher Lopez through his company, Knight Nguyen Investments.

20.     On September 29, 2016, Christopher Lopez sent an email to Mortgage Company 1 with an attachment containing a forged letter purportedly from UBS. According to the fraudulent letter, UBS confirmed the balance of $2.5 million in account xxxx138 for the benefit of Mortgage Company 1. The letter was purportedly signed by UBS Employee 1, but the

signature was forged and appears to have been digitally copied from the letter UBS sent to Nadir Torres on April 19, 2016.

21.     From on or about August 17, 2016 through June 16, 2017, Mortgage Company 1 paid Christopher Lopez via Knight Nguyen Investments a total of $173,656.93, which represented the interest payment they were required to make under the agreement with Christopher and Jayson Lopez on the non-existent $2.5 million.

*ii.     The misappropriation of Investor B's money*

22.     In September 2016, Investor B agreed to invest her retirement savings with Christopher Lopez. Christopher Lopez explained to Investor B that she would be investing $500,000 in Mortgage Company 1 in return for 9.25% interest. Mortgage Company 1 was supposed to pay monthly interest payments to Christopher Lopez, who would then transfer the payment to Investor B. Investor B's principal balance of $500,000 would be returned to her after five years.

23.     In or about late September 2016, Investor B transferred a total of approximately $671,456.43 to Christopher Lopez via Knight Nguyen Investments for him to manage. Investor B required Christopher Lopez to obtain her written, signed, and notarized authorization before he could invest any of her money.

24.     On or about October 11, 2016, Christopher Lopez transferred $449,900 belonging to Investor B to Mortgage Company 1. This investment principal was never returned to Investor B.

25.     On or about October 17, 2016, Christopher Lopez transferred $43,310 belonging to Investor B to Graphic Tools Company 1. Christopher Lopez never obtained Investor B's

authorization to invest her money in Graphic Tools Company 1, and this investment principal was never returned to Investor B.

26.     On or about October 27, 2016, Christopher Lopez transferred $19,990 belonging to Investor B to Graphic Tools Company 1. Christopher Lopez never obtained Investor B's authorization to invest her money in Graphic Tools Company 1, and this investment principal was never returned to Investor B.

27.     On or about November 2, 2016, Christopher Lopez transferred $91,810 belonging to Investor B to Medical Device Company 1. Christopher Lopez never obtained Investor B's authorization to invest her money in Medical Device Company 1, and this investment principal was never returned to Investor B.

28.     From on or about November 1, 2016 to November 7, 2017, Mortgage Company 1 paid Christopher Lopez via Knight Nguyen Investments a total of $50,104.08, which represented the interest payment on Investor B's $500,000 investment.

29.     From on or about November 2, 2016 to November 1, 2017, Investor B received a total of $80,954.02 in purported returns from Christopher Lopez via Knight Nguyen Investments. However, Investor B never received the return of her $671,456.43 investment principal.

## D.     The Blue Line Mining Investment Scam

30.     In or about March 2017, Christopher Lopez began to recruit investors to invest in a gold investment scam involving Blue Line Mining (Cyprus) and Blue Line Mining (Florida).

31.     On or about March 23, 2017, Jayson Lopez formed Blue Line Mining (Florida) in the State of Florida.

32.     Beginning in or about March 2017, Christopher Lopez and his associates solicited investors to invest money in "Blue Line Mining". Christopher Lopez and his associates told

investors that they were investing in a company that purportedly purchased gold in west Africa, shipped it to a gold refinery in Lebanon, and sold the gold for a profit. Christopher Lopez and his associates told investors false information about the investment, including that they would receive very large returns, and that their money was covered by insurance and secured by gold. However, Christopher Lopez and Jayson Lopez knew the gold investment was a scam that would not result in the shipment and sale of any gold, and that it would not generate any returns for the investors.

33.     In or about late 2017, Christopher Lopez applied for professional liability insurance for coverage to begin November 13, 2017. Despite Christopher Lopez's claims to his clients that their gold was insured, the insurance policy he applied for was a professional liability policy against errors and omissions, not an insurance policy for gold. Furthermore, Christopher Lopez provided the following false information in the application for the insurance policy:

> a.     Christopher Lopez falsely described his type of business as "Project manager (architecture or engineering)," when in truth and fact he was conducting business as an investment advisor.

> b.     Christopher Lopez falsely stated that the majority of his projects fall into the category of "Residential Homes," when in truth and fact he was conducting business as an investment advisor.

34.     From in or about March 2017 through March 2018, Christopher Lopez and his associates raised over $1.1 million from investors in the gold investment scam. Jayson Lopez facilitated the movement of this money through various banking platforms to conceal the fact that a significant portion of this money was misappropriated by Christopher Lopez, Jayson Lopez, Nadir Torres, and their associates for their own personal use. Some of the money was also used to pay fake returns to other investors in furtherance of the Ponzi scheme.

35.     In or about June 2018, Christopher Lopez and his associates told investors about a purported shipment of 25.4 kg of gold worth over $1 million that would result in significant profits to the investors. In truth and fact, Christopher Lopez and Jayson Lopez knew that the 25.4 kg shipment of gold did not exist.

36.     From in or about May 2017 through May 2018, Christopher Lopez and Jayson Lopez paid fake returns to the investors to create the false impression that their investments were generating real returns, in furtherance the Blue Line Mining investment scam.

37.     On or about November 1, 2018 Christopher Lopez submitted an insurance claim on his professional liability insurance policy in an attempt to be paid for the supposed lost shipment of over $1 million worth of gold. During the claim process, Christopher Lopez submitted false information to the insurance company, including a letter that listed $950,107.73 in payments that were purportedly made to Blue Line Mining (Cyprus) via an electronic money payment system. In truth and fact, a significant majority of this money went to Christopher Lopez, Jayson Lopez, Nadir Torres, and their associates for their own personal use, and to pay fake returns to other investors in furtherance of the Ponzi scheme.

38.     On or about November 29, 2018, Christopher Lopez's insurance claim for the purported lost shipment of gold was denied because the insurance policy was limited to claims related to construction management services.

39.     The investors in the Blue Line Mining investment scam lost all of the money they invested, other than the fake returns they received between May 2017 and May 2018 as described above.

**E.** **The Bioscience Company Investment Scam**

40.    In or about early 2015, Christopher Lopez was introduced to Scientist 1. Scientist 1 and others had received a patent on an anti-cancer drug that also had other potential uses. Christopher Lopez offered to form a company to help Scientist 1 develop and commercialize the anti-cancer drug.

41.    On or about April 21, 2015, Christopher Lopez incorporated Bioscience Company 1 in the State of Florida. Christopher Lopez was identified as an Officer and the Registered Agent of the company. Scientist 1 was identified as the President of the company.

42.    In or about late 2016, Christopher Lopez and Jayson Lopez informed Scientist 1 about a company called Orchid Europe Ltd. they claimed was willing to invest $50 million into Bioscience Company 1. The name "Orchid Europe Ltd." was chosen by Christopher Lopez and Jayson Lopez to create the false impression that this company was associated with Orchid Chemicals & Pharmaceuticals Ltd., also known as "Orchid Pharma Limited," a real pharmaceutical company headquartered in India.

43.    Christopher Lopez and Jayson Lopez falsely told Scientist 1 that Nadir Torres was the Chief Financial Officer of Orchid Europe, and that Orchid Europe would place approximately $50 million into a foreign bank account that Bioscience Company 1 would have access to after it reached clinical trials in its anti-cancer drug. In exchange, Bioscience Company 1 would issue shares of stock to Orchid Europe.

44.    On or about November 2, 2016, Christopher Lopez sent an email to Scientist 1 with the proposed agreement with Orchid Europe attached. The agreement contained a forged screen shot purporting to be a statement from the Royal Bank of Scotland ("RBS") for account number xxxx937 in the name of "Orchid Europe Ltd." The statement purports to show a balance

of 50 million Euros in the account as of October 15, 2016, which would have equaled approximately $53 million. The account statement was fake because Orchid Europe did not have an account at RBS.

45.    On or about November 4, 2016, Nadir Torres and Christopher Lopez executed the above-described agreement between Orchid Europe and Knight Nguyen Investments. However, Christopher Lopez and Nadir Torres both knew the agreement was a sham because the $50 million did not exist.

46.    On or about March 28, 2017, Christopher Lopez sent an email to Scientist 1 and Jayson Lopez that said "50mm deposited" with an attachment that was a forged bank account statement purportedly issued by RBS for account xxxxx937 in the name of Bioscience Company 1. The statement showed a balance in the account of 50 million Euros, which would have equaled approximately $53 million. However, the bank statement was forged and neither the RBS account nor the 50 million Euros actually existed.

47.    From in or about January 2017 through December 2018, Christopher Lopez and his associates raised over $1.1 million from investors in the Bioscience Company investment scam. Christopher Lopez provided false and misleading information to actual and potential investors in furtherance of the scheme, including:

a.    Christopher Lopez provided investors with false and fraudulent documents that inflated Bioscience Company 1's assets by including the non-existent $53 million RBS account.

b.    Christopher Lopez falsely told investors that he was going to help Bioscience Company 1 become publicly traded on the Bermuda Stock Exchange, which would result in substantial profits to the investors. However, Christopher Lopez never got Bioscience Company 1 listed on any public stock exchange.

48.    On or about March 12, 2018, Christopher Lopez used the name, date of birth, and social security number of Scientist 1 in a credit card application submitted to American Express

without Scientist 1's knowledge or permission. Christopher Lopez obtained credit cards in the name of Christopher Lopez, Jayson Lopez, and other associates of Christopher Lopez. Christopher Lopez and Jayson Lopez used these credit cards for personal expenses as well as business expenses.

49.     Christopher Lopez also obtained a credit card through this application in the name of Scientist 1. Christopher Lopez gave this card to Scientist 1 and left him with the mistaken impression that the card was a corporate credit card issued to Scientist 1 as an employee of Bioscience Company 1, rather than a credit card in his personal name.

**F.     The Fake U.S. Treasury Bond Scam**

50.     In or about June 2019, Person A became business partners with Christopher and Jayson Lopez. At this time, Person A was in possession of two documents purporting to be U.S. Treasury Bonds bearing serial numbers F49494957B and F49495012B (collectively, "the Fake Bonds"). The Fake Bonds purport to be worth $1 billion each; however, both of these documents are fraudulent, they are not obligations of the U.S. Treasury, and they have no actual value whatsoever. Christopher Lopez, Jayson Lopez, and Person A entered into an agreement in which Person A transferred the Fake Bonds to Christopher and Jayson Lopez, which Christopher and Jayson Lopez used to fraudulently inflate the value of their companies and encourage people to invest money in those companies.

51.     In or about late 2019, Christopher Lopez, Jayson Lopez, and Persons M, S, T-1, T-2, Z, and others created a complex structure of companies named with some variation of "Ping An Financial Services" in furtherance of the Fake Bond scam. The name "Ping An Financial Services" was chosen to create the false impression that these companies were associated with Ping An Insurance Group, a real company located in China. Notably, Person Z, listed as a

beneficial owner of Ping An (Cyprus), was also listed as a beneficial owner of Blue Line Mining (Cyprus). Also, Persons M and S, listed as Directors of Ping An (Cyprus), were also listed as Directors of Blue Line Mining (Cyprus).

52.     On or about January 11, 2020, Person A signed a document entitled "Fund Investment Manager Agreement," which transferred the Fake Bonds to Jayson Lopez. Jayson Lopez signed the agreement on behalf of Ping An (Singapore). The agreement also purported to be signed by Person T-1 on behalf of Ping An (Singapore), and Person M on behalf of Ping An (Cyprus).

**G.    Energy Company 1**

53.     In or about June 2019, Energy Company 1, a company headquartered in Houston, Texas, was looking for investors to fund a liquified natural gas project in Louisiana ("the LNG Project"). CEO B, the CEO of Energy Company 1, was introduced to Christopher Lopez as someone who could help Energy Company 1 raise money for the project.

54.     Christopher Lopez falsely told CEO B that he had access to $2 billion, and that he could obtain $50 million in U.S. Treasuries to invest in Energy Company 1. This was a reference to the Fake Bonds.

55.     Christopher Lopez proposed an agreement to CEO B where Christopher Lopez would help Energy Company 1 become publicly traded on the Bermuda Stock Exchange, which would result in substantial profits for Energy Company 1 shareholders. Christopher Lopez also falsely claimed that he had taken another company, Bioscience Company 1, public on the Bermuda Stock Exchange.

56.     Christopher Lopez introduced CEO B to Jayson Lopez as an officer of Ping An (Singapore). Jayson Lopez falsely told CEO B that Ping An (Singapore) had several billion

dollars in Cyprus to invest. Jayson Lopez sent CEO B material purporting to be from the real Ping An Insurance Group in China to give CEO B the false impression that Jayson Lopez was affiliated with Ping An Insurance Group.

57.     In or about September 2019, Christopher Lopez falsely told CEO B that he needed $10,000 to keep Person A's $50 million available to invest in the LNG Project. However, as Christopher Lopez well knew, this $50 million did not exist because Person A did not have $50 million, and the Fake Bonds were not authentic.

58.     On or about September 23, 2019, Energy Company 1 became skeptical about the authenticity of the Fake Bonds and requested an audit verifying that Christopher Lopez's company, Exempt Securities, actually owned $50 million in U.S. Treasury bonds.

59.     Despite its misgivings, and at Christopher Lopez's insistence, on or about September 24, 2019, Energy Company 1 wired $10,000 to Christopher Lopez through Exempt Management's BBVA account number ending in 6077 to keep the $50 million in Fake Bonds purportedly available to fund the LNG Project.

60.     On or about February 26, 2020, Christopher Lopez hired Auditor M to audit the financial statements for his company Exempt Securities. The financial statement Christopher Lopez sent Auditor M to audit claimed Exempt Securities owned $35 million of the Fake Bonds. Auditor M was unable to independently verify the authenticity of the Fake Bonds because Christopher Lopez advised Auditor M to contact Jayson Lopez to verify their authenticity. Despite being unable to independently verify the authenticity of the Fake Bonds, on or about March 15, 2020, Auditor M issued an Audit Report validating the Exempt Securities financial statement.

61.    On or about March 20, 2020, Christopher Lopez sent Auditor M's Audit Report to CEO B in an effort to obtain more money from Energy Company 1.

62.    Christopher Lopez never raised any money for Energy Company 1's LNG Project, and he never got Energy Company 1 listed on any public stock exchange.

## H.    Insurance Company 1

63.    In or about late 2018, CEO F, the CEO of Insurance Company 1, was introduced to Jayson Lopez, and in or about November 2019, CEO F told Jayson Lopez he wanted to raise money to purchase Real Estate Company 1 ("the Real Estate Project"). Jayson Lopez agreed to help CEO F raise money for the Real Estate Project through his company Ping An (Singapore) and other related entities.

64.    During the execution of the scheme, Jayson Lopez repeatedly sent CEO F marketing materials, news reports, and articles related to the real Ping An Insurance Group in China to give CEO F the false impression that Ping An (Singapore) was related to Ping An Insurance Group. As a result, CEO F was given a false sense of security that Jayson Lopez and Ping An (Singapore) would be able to follow through on their false promises.

65.    On or about December 12, 2019, Insurance Company 1 issued a check in the amount of $90,000 to Ping An (Singapore). According to Jayson Lopez, this payment was necessary before he would begin working on the Real Estate Project. On or about December 23, 2019, the check was deposited into Ping An (Singapore)'s BBVA account number ending in 4019.

66.    On or about February 6, 2020, Jayson Lopez and CEO F executed a "Subscription Agreement." In the agreement, Jayson Lopez falsely purported to transfer $250 million of the

Fake Bonds from Ping An (Singapore) to Insurance Company 1, in exchange for 2 million shares of Insurance Company 1's stock.

67.    On or about February 19, 2020, Christopher Lopez prepared an "Asset Valuation Report". According to the report, the Fake Bonds were worth more than $400 million each. In the report, Chris Lopez falsely claimed that it was based in part on "U.S. Treasury Department checks & confirmed issuance on U.S. Fed Bond Serial Numbers F4949457B, F49495012B as valid issued serial numbers by the U.S. Federal Reserve." From February 3 to March 18, 2020, CEO F sent wires totaling $38,831.95 to Christopher Lopez through Knight Advisory and Planning's Bank of America account ending in 3062, as payment for the false report.

68.    In or about February 2020, Christopher Lopez told CEO F that he would need to have Insurance Company 1's financial statement audited in order to raise money off of the Fake Bonds. Accordingly, CEO F hired Auditor A to perform the audit for Insurance Company 1. The financial statements provided to Auditor A included the $250 million in Fake Bonds that Insurance Company 1 had purportedly obtained from Ping An (Singapore).

69.    On or about February 21, 2020, Auditor A asked Jayson Lopez for contact information for certain officers of Ping An (Singapore) in order to verify the authenticity of the Fake Bonds. Jayson Lopez provided Auditor A with email addresses for Person S, Person M, Person T-1 as the purported directors of Ping An (Singapore), Person I from "Compliance", and Person T-3 from "Legal." Jayson Lopez knew these individuals would falsely verify the authenticity of the Fake Bonds, because many of them had also been involved in the Blue Line Mining investment scam. Persons S and M had also been directors of Blue Line Mining (Cyprus), and Person T-3 had also purportedly worked in the "Legal Department" of Blue Line Mining (Cyprus).

70.    On or about February 24, 2020, Person T-3 sent an email to Auditor A falsely stating, "[Ping An (Singapore)] is the legal custodian of US Treasury Reserve Bonds Serial Numbers F49495012B and that title to the face value of $250 million USD has been transferred to [Insurance Company 1] by way of [Ping An Fund]." On or about February 26, 2020, Auditor A submitted an audit report to CEO F validating Insurance Company 1's financial statement including the $250 million in Fake Bonds.

71.    On or about May 1, 2020, Jayson Lopez sent an invoice to CEO F for $228,000 which was purportedly going to be used to fund the Real Estate Project. From May 8 through July 14, 2020, CEO F sent Jayson Lopez wire transfers totaling $228,000 to Ping An (Singapore)'s BBVA account number ending in 4019.

72.    On or about July 14, 2020, Jayson Lopez and CEO F signed a "Note Purchase Agreement" between Ping An Fund and Insurance Company 1. According to the agreement, Ping An Fund was going to pay Insurance Company 1 $250 million in exchange for $250 million worth of notes that would accrue interest. The $250 million Insurance Company 1 was going to receive was going to fund the purchase of Real Estate Company 1. In addition, "Upon execution of this [Note Purchase] Agreement," Ping An Fund was required to deposit $25 million in an escrow account for Insurance Company 1 to apply towards the purchase price of Real Estate Company 1.  However, Insurance Company 1 never received any of this money.

73.    On or about April 16, 2021, CEO F received an invoice from Ping An (Singapore) for $28,950.00 for work purportedly done on the Real Estate Project. On or about April 20, 2021, CEO F sent Jayson Lopez a wire transfer of $28,950.00 to Ping An (Singapore)'s BBVA account number ending in 4019.

74.     In or about June 2021, Jayson Lopez told CEO F that he needed to send $200,000 in order to open up an account at Bank 1 for the Real Estate Project. This was false because Bank 1 does not charge any fees or require a minimum deposit to open up an account. On or about June 7, 2021, CEO F sent Jayson Lopez a wire transfer of $200,000.00 to Ping An (Singapore)'s BBVA account number ending in 4019.

75.     Insurance Company 1 never received any of the funding for the Real Estate Project that Christopher Lopez and Jayson Lopez had promised and the purchase of Real Estate Company 1 by Insurance Company 1 never occurred.

76.     Pursuant to the fraudulent scheme, Christopher Lopez, Jayson Lopez, and their associates defrauded Insurance Company 1 out of at least $594,385.75.

I.    **Investment Company 1**

77.     Investment Company 1 was formed to solicit money from primarily Australian investors. Investment Company 1 then looked for investment opportunities to invest these funds to generate a return for its clients.

78.     In or about June 2020, Director P, co-owner and Director of Investment Company 1, was introduced to Jayson Lopez. Jayson Lopez offered Director P purported opportunities to invest Investment Company 1's money through Ping An (Singapore) and its related entities.

79.     During the execution of the scheme, Jayson Lopez sent Director P marketing materials, news reports, and articles related to the real Ping An Insurance Group in China to give Director P the false impression that Ping An (Singapore) was related to Ping An Insurance Group. As a result, Director P was given a false sense of security that Jayson Lopez and Ping An (Singapore) would be able to follow through on their false promises.

80.     On or about November 4, 2020, Director P signed a "Product Sheet" on behalf of Investment Company 1. According to the Product Sheet, Investment Company 1 was purchasing 2 "Limited Partnership Units" in Ping An Fund for €200,000.00 (200,000.00 Euros). The Product Sheet claimed that Ping An Fund had assets totaling over $1.6 billion. On or about November 19, 2020, Director P wired $234,994.00 to Ping An (Singapore)'s BBVA account number ending in 4019 for the purchase of 2 Ping An Fund Limited Partnership Units.

81.     On or about December 15, 2020, Director P signed a second Product Sheet for Investment Company 1 to purchase another 8 Ping An Fund Limited Partnership Units for €800,000.00. On or about December 17, 2020, Director P wired $972,294.00 to Ping An (Singapore)'s BBVA account number ending in 4019 for the purchase of 8 Ping An Fund Limited Partnership Units.

82.     On or about December 22, 2020, Director P signed a third Product Sheet for Investment Company 1 to purchase another 100 Ping An Fund Limited Partnership Units for $10 million. On or about December 24, 2020, Director P wired $9,999,994.00 to Ping An (Florida)'s Wells Fargo account number ending in 1640 for the purchase of 100 Ping An Fund Limited Partnership Units.

83.     Beginning in or about January 2021, Investment Company 1 made repeated attempts to withdraw money from its Ping An Fund investment. Each time, Jayson Lopez and his associates provided Investment Company 1 with excuses for why they could not send any funds at that time.

84.     In or about May 2021, Jayson Lopez told Director P that Investment Company 1 would have to invest another €500,000 in order to be able to redeem money from its Ping An

Fund investment. From May 7 to June 3, 2021, Director P wired a total of $542,272.00 to Ping An (Florida)'s Wells Fargo account number ending in 1640.

85.    None of the money that Investment Company 1 invested was ever returned. Consequently, pursuant to the fraudulent scheme, Christopher Lopez, Jayson Lopez and their associates defrauded Investment Company 1 out of at least $11,874,642.00.

## COUNT ONE
### (Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h))

86.    Paragraphs 1 through 85 of this Informationare hereby incorporated by reference as though fully set forth herein.

87.    From in or about May 2015, and continuing through on or about January 15, 2025, in the Southern District of Texas and elsewhere, the defendant,

## CHRISTOPHER KNIGHT LOPEZ,

knowingly combined, conspired, and agreed with other persons to commit offenses against the United States in violation of 18 U.S.C. § 1957, to wit: to knowingly engage in monetary transactions by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is: wire fraud, in violation of Title 18, United States Code, Section 1957.

## MANNER AND MEANS

88.    The manner and means used to accomplish the objectives of the conspiracy included, among other things, the following:

a.    March 24, 2016 transfer of $24,000.00 from Aevum Holdings Bank of America account #xxxxx8457 to Mr. X Restaurant and Music;

b.  October 11, 2016 transfer of $449,900.00 from Knight Nguyen Investments Bank of America account #xxxxx3964 to Mortgage Company 1's J.P. Morgan Chase account #xxxxx3056;

c.  October 13, 2016 transfer of $165,030.00 from Aevum Holdings Bank of America account #xxxxx8457 to The S Group LLC account at SunTrust Bank;

d.  October 24, 2016 transfer of $200,030.00 from Aevum Holdings Bank of America account #xxxxx8457 to The S Group LLC account at SunTrust Bank;

e.  March 28, 2017 transfer of $60,766.45 from Knight Nguyen Investments Bank of America account #xxxxx9845 to K&K Investment;

f.  March 30, 2017 transfer of $186,000.00 from Knight Nguyen Investments Bank of America account #xxxxx9845 to PaySafe;

g.  July 19, 2017 transfer of $59,900.00 from Blue Line Mining's Bank of America account #xxxxx2621 to PaySafe;

h.  September 15, 2017 transfer of $80,000.00 from Blue Line Mining's Bank of America account #xxxxx2621 to PaySafe;

i.  March 14, 2018 transfer of $10,500.00 from Blue Line Mining's Bank of America account #xxxxx2621 to Resorts Advocate Group, LLC;

j.  April 27, 2018 transfer of $12,000.00 from Aevum Holdings Bank of America account #xxxxx8457 to Resorts Advocate Group, LLC;

k.  September 11, 2017 transfer of $19,166.67 from Biosciences Company 1's Bank of America account #xxxxx2515 to Christopher Lopez;

l.  October 17, 2017 transfer of $29,750.00 from Biosciences Company 1's Bank of America account #xxxxx2515 to Knight Nguyen Investments;

m.  March 16, 2018 transfer of $30,000.00 from Biosciences Company 1's Bank of America account #xxxxx2515 to Knight Nguyen Investments;

n.  April 2, 2018 transfer of $45,000 from Biosciences Company 1's Bank of America account #xxxxx2515 to Christopher Lopez;

o.  September 4, 2018 transfer of $17,500.00 from Biosciences Company 1's Bank of America account #xxxxx2515 to Jayson Lopez;

p.  August 9, 2019 transfer of $21,000.00 from Knight Advisory and Planning Bank of America account #xxxxx3062 to Christopher Lopez;

q.  December 13, 2019 transfer of $25,000.00 from Exempt Management PNC/BBVA account #xxxxx6077 to Sun Bear LLC;

r.  November 23, 2020 transfer of $64,287.50 from Exempt Management PNC/BBVA account #xxxxx6077 to Aevum Holdings Inc.;

s.  December 18, 2020 transfer of $950,000.00 from Ping An BBVA account #xxxxx4019 to Wells Fargo Clearing Services;

t.  December 21, 2020 transfer of $50,000.00 from Ping An BBVA account #xxxxx4019 to Aevum Holdings, Inc.;

u.  April 8, 2021 transfer of $215,000.00 from Ping An BBVA account #xxxxx4019 to Jayson Lopez;

v.  June 9, 2021 transfer of $200,000.00 from Ping An BBVA account #xxxxx4019 to Morgan Stanley;

w.  November 1, 2021 transfer of $198,829.37 from Ping An J.P. Morgan Chase account #xxxxx3209 to EDS Secured Risks Ltd.;

x.  December 23, 2021 transfer of $86,694.93 from Ping An J.P. Morgan Chase account #xxxxx3209 to EDS Secured Risks Ltd.;

y.  January 19, 2021 transfer of $8,500,000.00 from Ping An J.P. Morgan Wells Fargo account #xxxxx7513 to an account controlled by Law Firm X, which transfer was not necessary to preserve a person's right to representation under the sixth amendment to the Constitution.

All in violation of 18 U.S.C. §§ 1956(h).


Respectfully submitted,

Nicholas J. Ganjei
United States Attorney


_____
Justin R. Martin
Assistant United States Attorney
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 567-9000